# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-00621-SCT

*SHUNBRICA ANDREA ROBY a/k/a SHUNBRICA ROBY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/09/2014 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| TRIAL COURT ATTORNEYS: | LINDSAY CLEMONS |
| | KRISTEN WOOD WILLIAMS |
| | CLINTON MARTIN |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: HUNTER N. AIKENS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 01/28/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. A jury convicted Shunbrica Roby of deliberate-design murder, and the trial judge sentenced her to life in prison. Roby appeals to this Court, arguing (1) that the State's evidence was legally insufficient and that her conviction was against the overwhelming weight of the evidence; (2) that her Sixth Amendment right to confrontation was violated;

and (3) that the trial court erred in granting and/or refusing several jury instructions. We reverse and remand for a new trial based on the jury-instruction issue.

## FACTS AND PROCEDURAL HISTORY

¶2. On October 28, 2012, Shunbrica Roby drove to West Point to "bust the windows" out of her boyfriend Marcus Payne's car, because he had been seeing other women. Her cousins Natisha and Latwanna Roby were with her. They saw Payne's car at a gas station and pulled in behind him. Shunbrica got out with a hammer and began to break the windows out of his car. Payne emerged from the store and a struggle ensued. Initially the struggle was between Payne and Shunbrica only, but her cousins joined in, and ultimately Payne was stabbed. He was taken to a hospital where he later died. A grand jury indicted Shunbrica for deliberate-design murder in violation of Mississippi Code Section 97-3-19.[1] Shunbrica was tried on April 7–9, 2014, and the jury found her guilty.

¶3. At trial, the State presented ten witnesses in its case-in-chief. And because Shunbrica challenges the sufficiency of the evidence, we detail the testimony:

*Alexis Robinson*

¶4. Alexis Robinson testified that she knew Payne because he was dating her neighbor, Raina Brooks, and Robinson and Payne got "real close." On the night of October 28, 2012, she and Payne had gone to a party, and they then stopped at the One Stop Deli in West Point. Payne went into the store, and she noticed "somebody walking fast by the car, like with their

---

[1]The indictment charged Shunbrica with "unlawfully, willfully, and feloniously, with the deliberate design to effect death, [killing and murdering] a human being, Marcus L. Payne, without authority of law and not in necessary self defense, in violation of MCA §97-3-19 . . . ."

hand, like, on the side of them, behind their back." Robinson realized it was Shunbrica Roby.[2] Shunbrica looked at Robinson and then "rared back and . . . hit the [car] window with the hammer." Shunbrica then hit the windshield with the hammer, and Robinson jumped out of the car. Robinson was about to run to the store when Payne came outside, and he looked like "he seen a ghost."

¶5.	Shunbrica hit the window again, and she said "I told you about playing with me." Payne ran to the car, and he and Shunbrica began "tussling" and "fighting." Shunbrica was "slinging [Payne] against the car," and "both of them were just fighting." Robinson testified that she did not know whether Payne or Shunbrica had hit the other first, and that neither of them had anything in their hands during the fight. Payne was about Robinson's size, and Shunbrica was bigger than he was. Robinson testified that, after Payne and Shunbrica had been tussling for about two or three minutes, Natisha and Latwanna jumped out of the car, and

> they started holding [Payne] while she was fighting. All three of them, they were just grabbing and holding him, just – just beating him. They had his head, like – his head was down there. They had him by his hood. They kept pulling him, and they were just hitting him, just beating and jumping on him.

¶6.	The cousins were saying "Get him, Brica, get him." All three women were involved, and when the cousins jumped in, "it was just over with." Robinson did not try to stop the fight, because "they was way bigger than me, and then I was nervous . . . they was like ten times bigger than me . . . both of us little, that would have been a demolish." During the

---

[2]Robinson had been at Raina Brooks's house one time when Shunbrica had come by, and Payne had acted like he didn't know Shunbrica.

fight, someone said, "cut his neck, girl, cut his neck." Shunbrica did not say "no, stop, don't cut him." Robinson saw only the hammer; she never saw a knife. After the fight, the women just "threw [Payne] to the side," and he walked toward Robinson holding his shoulder and making a "hissing" sound.

¶7. Robinson testified that someone was saying "run him over," and that either Natisha or Latwanna got into the car and tried to run over Payne. A man pushed Payne out of the way, and he slid down the car, stumbled to the back and fell. Robinson realized at that point that Payne had been stabbed, because blood "just started spewing there on the ground."

¶8. Shunbrica started walking toward Payne, but someone yelled "call the police," and Shunbrica ran and got into another car. Natisha and Latwanna had driven off and left Shunbrica. Robinson identified Shunbrica in the courtroom as the woman who got out of the car with a hammer and started the altercation.

¶9. On cross-examination, Robinson reiterated that she did not see a knife and that she could not say who stabbed Payne. She said that it was one of the other women yelling at the gas station, not Shunbrica.

*Juanita Yates*

¶10. Juanita Yates was at the gas station that evening, and she waited in the car while her husband went in to get cigarettes. She saw a Honda pull up, and a "guy" got out and went into the store. About two minutes later, another car pulled up with three females in it, and the driver [Shunbrica]—who was wearing a white t-shirt—got out and hit the back window of the Honda with "whatever she had in her hand." The driver then hit the windshield, and

4

the girl inside the car got out and ran to the store.

¶11.    The driver of the Honda [Payne] came out of the store and said "What's wrong with y'all?  What y'all doing, messing with my car?"  Shunbrica hit Payne on the shoulder with the object that she had in her hand.  Payne tried to push her away, and he was saying "Y'all go on, man, you know, go on."  Yates did not see Payne hit Shunbrica, but she saw him try to push Shunbrica away from him.  Payne and Shunbrica were "arguing and tussling," and then the other two women got out of the car.  The women said "uh-oh, he messing with my cousin," "he hit my cousin."  Yates thought that the woman wearing lime-green pants was just "regular punching" Payne, but then she realized otherwise when she saw "a lot of blood."

¶12.    Yates testified that she never saw a knife, but that "it had to be something, because once she – they were doing that, so I thought she was punching him at first, but then the blood came out, and I knew it had to have been something, you know, to hurt him."  Shunbrica was not with the other two women when Yates saw the blood.  After Yates saw the blood, Shunbrica "got back in the car like she was trying to run [Payne] over."  Natisha and Latwanna jumped in the car and drove off, leaving Shunbrica.  Shunbrica said "Marcus, Marcus, get up, get up.  Please don't die, don't die."  Yates testified that, in her opinion, she didn't "think the driver [Shunbrica] knew that the boy had been stabbed till she seen him collapse, you know, on the ground."

¶13.    Yates testified that you could "wring the blood" out of Payne's jeans.  After Natisha and Latwanna left, Shunbrica went to the road, and a car stopped and picked her up.  Yates identified Shunbrica in the courtroom as the woman who had hit the car and had hit Payne.

¶14.    On cross-examination, Yates reiterated that she did not see Shunbrica with a knife. And when she saw the woman in the lime-green pants [Natisha] making an upward motion, Shunbrica was not there jumping on Payne at that time. Yates also testified that Shunbrica did not realize Payne had been stabbed when she was telling him to get up:

> At the time she didn't know he had been stabbed, because when he – when he – when she noticed that he was stabbed, that's when she was, you know, upset, because she – she wasn't there with the girls when they was –she wasn't over where the girls were when they were doing that, you know.

On redirect, Yates testified that she heard somebody say "cut his throat, cut his throat," but she did not remember who said it.

### *Rodney Harris*

¶15.    Rodney Harris was in the gas station the night of the incident. He testified that he saw three girls get out of a car and start beating Payne's car with what looked like hammers. Payne ran up to them and they began arguing, and then they began fighting. After three or four minutes, Payne ran up to the door bleeding and asked them to call an ambulance.

¶16.    As Harris turned to tell the clerk to call an ambulance, Payne ran back to the women's car and began beating on the driver's side. The women made a U-turn and came back to the parking lot, and they started fighting again. After about three minutes, two of the women left and one of them stayed behind. The one who stayed behind was trying to walk Payne back to his car, but she left when he collapsed and got in another car. While she was walking with him, she asked him "why he did her like that or something." Harris identified Shunbrica in the courtroom as the woman who was walking Payne back to his car.

6

¶17.   On cross-examination, Harris testified that he did not see any knife nor any stabbing. He did not remember who hit whom first. Harris testified that he didn't think that Shunbrica knew how badly Payne was hurt: "she was just walking with him and crying, and I didn't think she realized how bad he was bleeding until she actually looked at [it] herself."

*Patrice Powell*

¶18.   Patrice Powell and Shunbrica's brother had a child together, so Shunbrica was her son's aunt. Powell testified that on the day of the incident, Shunbrica asked if Powell had seen Payne's car in town. Powell told her, yes, she had seen Payne's car that morning at Raina Brooks's house, which was about half a block away from her house. When Powell told Shunbrica that Payne's car was in West Point:

> [Shunbrica] just told me that – she asked him good, was he still dating Ms. Brooks, and he said no. And she was like, "Well, I'm just tired of it. I'm not going to worry about it. Next time he come over to my house, I'm just going to bust his window out." That's all she said.

¶19.   Later that night, Shunbrica came by Powell's house to see her nephew and to bring some clothes she had bought for him. Her cousins "Tisha" and "Twanna" were with her. After Shunbrica left, Powell was on her way to the ATM when she saw a "commotion" going on at the gas station. Powell said she was "being nosy," so she turned around and drove back by the store. She did not know who was involved in the commotion, but as they came back by the store, she saw Shunbrica walking past the gas pump and flagging her down. Shunbrica got in Powell's car and asked Powell to take her to another store.

¶20.   Shunbrica said that "her and Marcus and her cousin had got into an argument," or "they got into it." She said her cousin had left her at the store and she needed a ride home.

7

She asked Powell for a ride to Columbus, where she lived, but Powell refused. Shunbrica made a phone call while she was in the car, Powell assumed, to one of her cousins. Shunbrica asked them where they were, and "they said that the police had them." Powell ultimately told Shunbrica to get out of the car at a store down the road, because "we heard a bunch of sirens, and we really didn't know what had happened at the store, and we really didn't want to get involved."

¶21.  Powell talked to Shunbrica later that night, and Shunbrica said "she didn't know what happened, and she wanted me to call to the hospital to see did they have a Marcus." When asked if she was aware of any ongoing issues between Shunbrica and Payne, Powell said that she had "heard a couple of incidents," and that she had "heard she busted a window out before."

¶22.  On cross-examination, Powell testified that she did not see the altercation, nor did she see Shunbrica with a knife. Powell also testified that she did not see any blood on Shunbrica when Shunbrica got in her car.

### Diane Isbell

¶23.  Diane Isbell was at home the night of the incident. A girl she did not know knocked on her door around 11:30 p.m. and asked to use her telephone. The girl told her she was from Okolona and was calling Okolona because she needed a ride home. The girl was "very distraught, very – crying a whole lot. Crying really hysterical like. A lot of crying." Isbell overheard some of the girl's conversation, and she heard her say that "I believe my cousin

8

stabbed my boyfriend. Because there was blood on his jeans." The girl said something along the lines of "I was trying to get him, but he was unresponsive, I couldn't wake him up."

¶24. Isbell asked the girl why she had a scratch on her face, and she responded that she and her boyfriend had been " into it." Isbell overheard the girl say that "all she did was burst his window out." And she said that "tearfully. She was crying." The girl said her cousins were with her earlier that night, and she kept saying that she wanted "to know what happened to him." Isbell asked her why she didn't call the police to see if they could tell her what happened, but the girl said "no," "because they already got my two [cousins]." Isbell called the hospital for her, but they said they did not have her boyfriend yet. When asked by the prosecutor if the girl that came to her door that night was in the courtroom, Isbell said that she could not remember what the girl looked like. On cross-examination, Isbell testified that the girl did not have any blood on her; just a scratch on her face. She said that the girl was crying "hysterically," "I mean constant crying."

### Tara Sloane

¶25. West Point police officer Tara Sloane was patrolling when 911 relayed a call in reference to the incident. Sloane alerted 911 that she had observed a vehicle traveling north, away from the gas station, at a high rate of speed and in the wrong lane. She assumed that the vehicle had been involved in the incident, so she pulled it over. Two women got out of the vehicle and began to walk toward Sloane, but she advised them to get back into the car, because of the reported incident and because the driver "had blood all over her."

9

¶26. Sloane advised them to drive back to the store. When asked by the prosecutor whether the women said anything about being at the store earlier, Sloane testified:

A. The driver did.
Q. Okay. What did she say?
A. She said – she said that her cousin, Shunbrica, had stabbed her boyfriend, Marcus.
Q. Okay. So she told you that Shunbrica had stabbed Marcus?
A. She did.

Defense counsel made no objection to this testimony. The women drove back to the store with Sloane following them.

¶27. Sloane observed Payne lying behind his vehicle in a pool of blood. She did not know Payne or the women she had pulled over personally, but their names were Natisha and Latwanna Roby. Sloane did not remember collecting Natisha and Latwanna's clothes, but she knew they were collected. Shunbrica was not at the scene when Sloane returned with the cousins, and she did not come to the police department that night. An ambulance transported Payne from the scene to a hospital in Tupelo, where he later died following an operation.

¶28. On cross-examination, Sloane reiterated that Natisha had a large amount of blood on her clothing. Defense counsel then returned to the statement Natisha had made during the traffic stop and questioned Sloane about it for some time:

Q. And you testified that at that time, when you stopped Ms. Latwanna and Ms. Natisha Roby, that Natisha Roby made a statement to you? Do you recall that testimony?
A. Yes.
Q. Okay. And that that statement was that my client, her cousin, Shunbrica Roby, had stabbed her boyfriend, Marcus Payne. Do you recall that testimony?
A. Yes.
. . .

10

Q.  Wouldn't you agree with me that at the time Natisha Roby made that statement to you, you had -- it was when you had apprehended her after she had fled the scene of the crime, wouldn't you agree with me that she was, at that time, at least a suspect in the case?
A.  I would say so, yes.
. . .
Q.  When Ms. Roby, Ms. Natisha Roby, made that statement to you, you thought that she might be a suspect, correct?  You've testified to that?
A.  I would -- I would -- I would say that -- that -- that there was -- she had some kind of involvement, you know, in the incident.  I wouldn't say that -- I don't think a suspect, but I -- something happened, she knew about it.
. . .
A.  So you'd agree with me that it's possible that on the night of October 28th, when you apprehended Ms. Natisha Roby, that statement she made about her cousin, Shunbrica Roby, stabbing Mr. Payne, you would agree that she could have just been trying to -- trying to keep herself from being arrested for murdering Mr. Payne?  Wouldn't you agree with that statement?
A.  No.

*Albert Lee*

¶29.   Lieutenant Albert Lee was working as an investigator on the night of the incident. The 911 dispatcher notified him that there had been an assault at the gas station.  Officers already were on the scene when he arrived, as well as bystanders, so he taped off the crime scene.  He then tried to assist Payne; he noticed a lot of blood and notified 911 that the paramedics needed to hurry.  Payne was in a fetal position on the ground behind his vehicle, and he was not able to tell Lee anything.  Lee noticed a single stab wound on Payne's left torso, under his arm.

¶30.   Sloane arrived at the crime scene with Natisha and Latwanna, and Lee testified that both of them had blood on their clothes and boots.  Lee asked Sloane to take the cousins to the jail until he could speak with them, rather than interviewing them on the scene.  Lee took photos of the cousins before they left for the jail.  Lee testified that he recovered a "black-

11

handled steak knife" from the scene, and he found one of Shunbrica's earrings next to it. The knife was sent to the crime lab for testing, but it had since been misplaced in the police department vault. The crime lab technicians were unable to recover any fingerprints from the knife, because it was so saturated with blood. Lee's fellow investigators took swabs from inside the car the Robys drove and sent them to the crime lab for testing as well.

¶31.   Lee asked the store manager about any video surveillance that might be available. Lee viewed the recording, but the actual altercation was not captured on the footage. On the video, Lee did see Shunbrica behind Payne's car when he was on the ground: "You could tell that she was saying something to him, maybe even trying to aid him, but I guess shortly thereafter she is seen in the video actually rising up and kind of running away from where he was behind the car." Lee testified that he first interviewed Shunbrica a day or two after the incident. She did not come to the police station on her own; Lee had someone get in contact with her and ask her to come see him. Shunbrica did not bring the clothes that she was wearing the night of the incident.

¶32.   Lee read Shunbrica her *Miranda* [3] rights, and Shunbrica signed a waiver, indicating she was willing to talk with Lee. Lee generated a transcript of Shunbrica's statement, and the transcript was entered into evidence and provided to the jury. The State also played the audio recording of Shunbrica's statement for the jury. Lee testified that at some point during the interview, he remembered Shunbrica saying that Natisha had been in a very abusive relationship. The prosecutor ended her direct examination of Lee by asking: "at some point

---

[3]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed 2d 694 (1966).

12

during that statement, you said, 'I've got witnesses that say you had the knife.' Were you referring to co-defendants at that time?" Lee said "yes," and defense counsel made no objection.

¶33. On cross-examination, defense counsel continued to ask Lee about the co-defendants' statements:

> Q. And during the course of your investigation, you did not have any witness, other than a co-defendant, tell you that my client stabbed Mr. Payne; is that correct?
> A. That's correct.
> . . .
> Q. Now you had testified a minute ago that the only people that indicated to you that my client, Shunbrica Roby, stabbed Mr. Payne were one of two of the co-defendants in this case; is that correct?
> A. Correct.
> . . .
> Q. So wouldn't you agree with me, Detective Lee, that Ms. Shunbrica Roby was actually, on that night, trying to protect Mr. Payne from her cousins?
> A. No.
> Q. You wouldn't agree with that statement?
> A. No.
> Q. But you – you would agree with me that the evidence in this case does not indicate that Ms. Shunbrica Roby stabbed Mr. Payne?
> A. No more evidence than the two co-defendants saying that she did it –
> Q. Right.
> A. – and the fact that we got Mr. Payne deceased.

*Shunbrica Roby's Statement*

¶34. As mentioned above, Shunbrica's statement was introduced into evidence and played for the jury during Lee's testimony. Shunbrica stated that she and her cousins had come to West Point because Payne was over at his ex's house. Shunbrica confirmed that, when she saw Payne's car at his ex's house, that made her upset. She also confirmed that she left home with a knife for protection, and a hammer because she was "gonna bust [Payne's] window."

13

They passed by a store and saw Payne's car. Shunbrica "hopped out and opened his door," because she was "trying to see who was in the car with him." She busted his window, and her cousins "hopped out [of] the car." Lee asked what Shunbrica's cousins did when they got out of the car, and Shunbrica responded that "they was jumping on him." Shunbrica said that she did not hit Payne; she dropped the hammer. She thought that Natisha had the knife.

¶35. When she left the store, she "hopped in the car with somebody in a blue car"; she did not know who it was. They "put her out down the road and [she] ran." Shunbrica said that she did not have blood on her. Shunbrica said that she did not cut Payne and that she did not touch him at all. When asked if Natisha was the one who stabbed Payne, Shunbrica responded affirmatively. But when asked if she was sure, Shunbrica said that she "didn't know about that. She's [Natisha's] the only one that was fighting with him and when she left blood (inaudible)."

¶36. Shunbrica denied having the knife in her hand when she got out of the car. When Lee said "I have a witness say they seen two things, two somethings in your hand," Shunbrica responded:

> A. (inaudible) . . . all I did was bust his two windows out with the hammer. That's the only thing I did. I didn't touch him with no knife (inaudible) . . .
> Q. (Inaudible) . . .
> A. Just to, just to bust his windows and then go back home.
> Q. But why'd you have the knife to bust the window out?
> A. I had just put the knife in the car but I didn't use the knife. I didn't use the knife at all.
> Q. How did the knife get out of the car?
> A. Sir, I don't know. (inaudible) . . . no knife or the hammer, just used the hammer for to bust his windows out. I didn't stab Marcus (inaudible) . . .
> Q. Well, why would your cousin want to stab him?
> A. She was trying to help me, (inaudible) . . . helping me (inaudible)

14

. . .
Q. Why they saying you did it?
A. I didn't do it.
Q. They say you did.
A. My cousins say I did it?
Q. They, the word we got is that you stabbed him.
A. I ain't stabbed Marcus. (inaudible) . . . two little kids, I did not stab him at all.
. . .
Q. So who stabbed Marcus?
A. (inaudible) . . . (crying) . . .
Q. And how do you know that?
A. Cause (inaudible) . . . she had her head down and she was just (inaudible) . . . I know she stabbed him. When she got thru (inaudible) . . .

Shunbrica said that she ran because she was scared, but that she cared about Payne and loved him. When the people who picked her up at the store let her out, she ran to "some old lady's house" to use the phone.

¶37. Shunbrica then said:

A. We wasn't fighting. We weren't fighting at all. He just hit me in my eye (inaudible) . . . right here and I ran back in the car . . . .
Q. Was at, was at any time all three of y'all fighting him together?
A. No, I was trying to get them off him.
Q. Why was you trying to do that?
A. Because I didn't want them to do nothing bad to him. I know my (inaudible) . . . I know them.
Q. What you mean by that?
A. I know they do stupid stuff and I know (inaudible) . . . (crying) . . .
Q. When y'all left from Columbus what was y'all plan, to come over here and bust the window?
A. My plan to come bust his window and just leave and go back home.
Q. Who brought the knife? How'd the knife (inaudible) . . .
A. I brought the knife from my cousin's house. I put it in the car. Put it in the dashboard.
Q. And why'd you do that?
A. Because I always carry my knife (inaudible) . . .

*Dr. Lisa Funte*

15

¶38. Dr. Lisa Funte was the medical examiner who performed Payne's autopsy. Dr. Funte observed some "lesions" on Payne's right cheek, the right side of his nose, and to the right side of his forehead. Dr. Funte testified that the marks on his face "could have been the result of a struggle," but "they could be from anything else too."

¶39. Dr. Funte testified that the wound on Payne's body, both internal and external, was consistent with the knife recovered by Lee at the scene. Payne's internal "wound track" went between the ribs and perforated the upper lobe of his left lung and then penetrated the wall of the left ventricle of his heart. Dr. Funte testified that a "significant amount" of blood was lost, and that Payne was in shock, eventually bleeding to death.

### *Joseph Heflin*

¶40. Joseph Heflin was a forensic biologist at the Mississippi Crime Laboratory, specializing in serology and DNA analysis. Heflin testified generally about several of the clothing items from the crime scene, as well as the inside of the vehicles and the knife. The items tested positive for the presence of blood, and they were retained at the crime lab for DNA testing.

### *Nathan Holly*

¶41. Nathan Holly was a forensic biologist at the crime laboratory, specializing in DNA analysis. Holly testified that "[b]asically every sample that [he] tested was consistent with the victim [Payne]."

¶42. The State rested after Holly's testimony. Roby moved for a directed verdict, which the trial judge denied. Roby then rested her case without presenting any evidence. After

deliberation, the jury found her guilty of murder, and the judge sentenced Roby to life in prison. The trial judge denied her post-trial motions, and Roby now appeals, arguing three points of error: (1) that the State's evidence was legally insufficient and that her conviction was against the overwhelming weight of the evidence; (2) that her Sixth Amendment right to confrontation was violated; and (3) that the trial court erred in granting and/or refusing several jury instructions.

## ANALYSIS

### I-A.  Roby's conviction was supported by sufficient evidence.

¶43.  "[I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows 'beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005) (citations omitted). "However, this inquiry *does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.*' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *Id.* (citations omitted) (emphasis added).

¶44.  "[I]f a review of the evidence reveals that it is of such quality and weight that, 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men

in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." *Id.* (citations omitted).

¶45. Roby was charged with deliberate-design murder, as set forth in Section 97-3-19(1)(a) of the Mississippi Code, which states: "(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases: (a) When done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder . . . ." Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). "[P]remeditation is an element of murder." *Fears v. State*, 779 So. 2d 1125, 1131 (Miss. 2000). And by definition, premeditation "connotes a prior design to kill for some appreciable time. Appreciable time allows the opportunity for reflection and consideration before committing the act." *Id.*

¶46. We conclude that, from this record, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Robinson testified that Shunbrica broke out Payne's car windows and said "I told you about playing with me." Robinson also testified that Shunbrica was "slinging [Payne] against the car," and that "both of them were just fighting." Robinson testified further that Shunbrica's cousins were "holding" Payne while she was fighting him, and that they were just "beating and jumping on him."

¶47. Robinson also testified that someone shouted "cut his neck, girl, cut his neck." And although Robinson later testified that it was one of the cousins who shouted that, she also

testified that Shunbrica did not say "no, stop, don't cut him." After the fight, Robinson said the women just "threw [Payne] to the side."

¶48. Yates testified that Shunbrica hit Payne on the shoulder with the object that she had in her hand. Yates also testified that Shunbrica "got back in the car like she was trying to run [Payne] over." Yates testified further that she heard someone yell "cut his throat, cut his throat," and that she did not recall hearing Shunbrica say "no, don't do that."

¶49. Harris testified that while Shunbrica was walking back toward the car with Payne, she asked him "why he did her like that or something." And Powell testified that Shunbrica called her to ask if Payne's car was at his ex-girlfriend's house. When Powell said it was, Shunbrica said she was "tired of it," was not going to worry about it, and was going to bust his windows out. Powell testified that when Shunbrica got in her car after the incident, she said that "her and Marcus and her cousin had gotten into an argument," or "they got into it." Powell testified further that she had heard of a "couple of incidents" between Shunbrica and Payne in the past, and that she had heard that Shunbrica had "busted a window out before."

¶50. Isbell testified that the girl who came to her house to use the telephone told her that she and her boyfriend "had been into it." Officer Sloane testified that one of the cousins had said that Shunbrica had stabbed her boyfriend Marcus. During Shunbrica's statement, Lee told her that he had witnesses who had said that Shunbrica had "two somethings" in her hand, and that she had stabbed Payne.

¶51. And Shunbrica admitted that she came to West Point because Payne was over at his ex's house, and that upset her. When she saw Payne's car, she opened his door because she

19

was "trying to see who was in the car with him." She also admitted that she left home with a hammer because she was going to break his windows. She admitted further that she brought a knife from her cousin's house and put it on the dashboard of the car, because she "always [carries her] knife." And this Court repeatedly has said that "malice, or deliberate design, may be inferred from use of a deadly weapon." *Brown v. State*, 176 So. 3d 1, 12 (Miss. 2015) ("The use of a deadly weapon is *prima facie* evidence of malice, because a man must be taken to intend the necessary and usual consequences of his act. To shoot or *stab, or strike with a bludgeon*, indicates a purpose to take life . . . .") (citations omitted) (emphasis added).

¶52. In sum, we conclude that, viewing the evidence in the "light most favorable to the prosecution," a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt—that Shunbrica intended to kill Payne and that she had "appreciable time" to reflect upon her actions before committing (or assisting in) the act.

**I-B. Roby's conviction was not against the overwhelming weight of the evidence.**

¶53. This Court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would *sanction an unconscionable injustice*." *Bush*, 895 So. 2d at 844 (emphasis added). The evidence must be viewed in the light most favorable to the verdict, and a new trial should be granted only when the evidence preponderates heavily against the verdict. *Cotton v. State*, 144 So. 3d 137, 142 (Miss. 2014). For the reasons stated in the sufficiency-of-the-evidence analysis, we do not find that Roby's conviction was an "unconscionable injustice."

**II.    Roby forfeited her right to argue a Confrontation Clause violation.**

¶54.    Roby argues next that her Sixth Amendment right to confrontation was violated twice during the State's case-in-chief: first, when Officer Sloane testified that Natisha had stated that Shunbrica had stabbed her boyfriend Marcus, and then when her unredacted statement was introduced into evidence and played for the jury, in which Detective Lee recounted statements that the cousins had made implicating Roby.  As mentioned before, defense counsel did not object either to the officer's testimony or to the introduction of Roby's statement, so this Court would have to address this issue as plain error.

¶55.    "Generally, preservation of an issue for appeal requires a contemporaneous objection at trial."  *Kirk v. State*, 160 So. 3d 685, 692 (Miss. 2015) (citations omitted).  But "[t]he doctrine of plain error permits this Court to consider, in spite of a lack of a contemporaneous objection at trial:

> obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right. *For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity, or public reputation of judicial proceedings.*

*Id.* (citations omitted) (emphasis added).

¶56.    The admission of the cousins' out-of-court statements here was violative of Roby's Sixth Amendment right to confrontation.  "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d. 177 (2004).  "A witness's testimony against a defendant is thus

21

inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309, 129 S. Ct. 2527, 2531, 174 L. Ed. 2d 314 (2009) (citation omitted).

¶57.    "Testimonial" statements, at a minimum, include police interrogations. *Crawford*, 541 U.S. at 68. "Testimonial" statements also include "material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or *similar pretrial statements that declarants would reasonably expect to be used prosecutorially*," as well as "statements that were made under circumstances *which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial*." *Melendez-Diaz*, 557 U.S. at 310 (citations omitted) (emphasis added).

¶58.    But defense counsel did not object to the cousins' statements implicating Roby when they were recounted by Sloane and Lee. Instead, defense counsel actually highlighted the out-of-court statements by devoting a large amount of time to recounting and discussing them during cross-examination.

¶59.    This Court addressed a similar scenario recently involving questionable testimony admitted without objection in *Kirk v. State*, 160 So. 3d 685 (Miss. 2015). There, a deputy who had responded to a domestic-violence call testified at trial that he noticed "strangulation marks" on the victim. *Id.* at 691. The jury convicted Kirk of aggravated domestic violence, and on appeal, Kirk argued that it was "plain error for the trial court to permit a law enforcement officer to testify to medical causation . . . " *Id.* at 691-92. This Court began its analysis of the issue by noting that Kirk did not object to the testimony, but that "in spite of

the failure of trial counsel to interpose an objection, Kirk claim[ed] that the doctrine of plain error applie[d]." *Id.* at 692.

¶60.  In dismissing that argument, this Court said unanimously:

> While Deputy Strait may have been able to testify regarding his observations, e.g., that Casey's neck had red marks on it, his testimony that it appeared Casey had been strangled constituted the sort of testimony properly reserved to an expert. *Nevertheless*, *the defense waived any potential objection to this testimony by, instead of objecting to or moving to strike Strait's testimony regarding strangulation or moving for a mistrial, emphasizing it on cross examination.*
> . . .
> Defense counsel failed to move for a mistrial. Nor did defense counsel object or move to strike the . . . testimony.  Instead, defense counsel interrogated Strait not only in an effort to call into question Strait's expertise regarding strangulation, but also to adduce one of the defense's theories of the case, that the marks on Casey's neck had been self-inflicted. *Defense counsel cannot now attempt to assign this error to the trial court. It certainly cannot claim that it was an "obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right," nor was it "an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity, or public reputation of judicial proceedings." Johnson*, 2014 WL 971542, *4, 155 So. 3d at 738.

*Kirk*, 160 So. 3d at 693-95 (emphasis added).  We find that this reasoning controls here.  Just as in *Kirk*, inadmissible testimony was admitted here without objection.  And, also, just as in *Kirk*, defense counsel then emphasized that testimony on cross-examination in an effort to shift the focus away from their client.  As such, Roby may not "now attempt to assign this error to the trial court." *Id.* at 694-95.

¶61.  Moreover, we find that no "manifest miscarriage of justice" occurred for the additional reason that the State presented sufficient evidence for the jury to find that Roby committed deliberate-design murder even *without* the cousins' statements, especially since

23

the State did not argue that Roby was the one who actually stabbed Payne. So in sum, we find this issue is without merit for purposes of Roby's direct appeal.

### III. Jury Instruction S-10 requires reversal.

¶62.    Roby argues finally that the trial judge erred when he (1) refused instruction D-3 regarding malice aforethought; (2) refused instructions D-7, D-8, D-9 and D-10 regarding reasonable doubt; and (3) granted instruction S-10. While we find no merit to Roby's arguments about her malice-aforethought and reasonable-doubt instructions, we do find that the trial judge erred when he granted S-10.

¶63.    This Court reviews jury instructions under an abuse-of-discretion standard. *Thompson v. State*, 119 So. 3d 1007, 1009 (Miss. 2013). This Court must read the instructions as a whole to determine if the jury was properly instructed. *Johnson v. State*, 908 So. 2d 758, 764 (Miss. 2005). If the instructions as a whole "fairly announce the law of the case and create no injustice," this Court will not reverse. *Id.*

#### Instruction D-3

¶64.    Importantly, Roby "does not claim that granting instruction S-3 was error in itself," but argues instead that "instruction S-3 draws dangerously near to condemnation because it nearly eliminates the requirement that deliberate design or malice aforethought exist at all." As such, Roby argues that the trial judge should have granted D-3 as a "critical missing link to the jury's full understanding of the state of mind that it was required to find . . . ."

¶65.    Instruction S-3 provided:

> The Court instructs the Jury that the term "malice aforethought" as used in these instructions means intent to kill without authority of law and not being

24

legally justifiable, legally excusable or under circumstances that would reduce the act to a lesser crime. Malice aforethought cannot be formed at the very moment of the fatal act; however, malice aforethought need not exist in the mind of the Defendant for any definite period of time. If there is malice aforethought, and it exists in the mind of the Defendant but for an instance [sic] before the fatal act, this is sufficient malice aforethought to constitute the offense of First-Degree Murder.

Proffered instruction D-3, which Roby argues would have "further defined this state of mind," provided:

The Court instructs the jury that "deliberate design" as it is used in these instructions, means an intent to kill without authority of law, and not being legally justifiable, or legally excusable. "Deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan or contemplate. "Deliberate design" to kill a person may be formed very quickly, and perhaps only moments before the act of killing the person. However, a "deliberate design" cannot be formed at the very moment of the fatal act.

¶66.   We disagree with Roby's argument. This Court previously has approved an instruction that was almost identical to S-3 as properly defining deliberate design:

A deliberate design cannot be formed at the very moment of the fatal act, however, the deliberate design need not exist in the mind of the Defendant for any definite time, not for hours, days, or even minutes, *but if there is deliberate design, and it exists in the mind of the Defendant but for an instant before the fatal act, this is sufficient deliberate design* to constitute the offense of Murder.

*Theodore v. State*, 798 So. 2d 465, 470 (Miss. 2001) (emphasis added). As such, S-3 was a correct statement of the law, and the trial judge did not abuse his discretion by refusing D-3 as repetitive. This issue is without merit.

**Instructions D-7, D-8, D-9, and D-10[4]**

---

[4]A review of the transcript reveals that Roby's counsel *agreed* that D-10 was repetitive when it was challenged by the State. Thus, Roby has forfeited her argument

¶67. Roby argues next that the trial judge erred by refusing several of her proffered reasonable-doubt instructions. D-7 provided:

> The Court instructs the jury that you cannot convict Shunbrica Roby upon mere suspicion, probabilities and speculation as to her guilt, and unless the State of Mississippi has proven her guilt beyond a reasonable doubt, then it is your sworn duty to find the Defendant Shunbrica Roby Not Guilty.

And D-8 provided:

> The defendant in every criminal case is presumed to be innocent unless his or her guilt is established by the evidence beyond a reasonable doubt.

> Before the presumption of innocence leaves the defendant, every material allegation of the indictment must be proven by the evidence beyond a reasonable doubt. The presumption of innocence accompanies and abides with the defendant as to each and every material allegation of the indictment through each stage of the trial until it has been overcome by the evidence beyond a reasonable doubt.

> If any of the material allegations of the indictment is not proven beyond a reasonable doubt, you must give the Defendant Shunbrica Roby the benefit of the doubt and find her Not Guilty.

The trial judge denied both of these instructions as repetitive. And it is well-settled that "[t]he trial judge is under no obligation to grant redundant instructions." ***Bell v. State***, 725 So. 2d 836, 849 (Miss. 1998).

¶68. Here, C.01 instructed the jury that its verdict should "be based on the evidence and not upon speculation, guesswork or conjecture." C.12(a) instructed the jury that:

> The law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State the burden of proving the Defendant guilty beyond a reasonable doubt. The presumption of innocence attends the Defendant throughout the trial or until it is overcome by evidence

regarding this instruction, and we do not discuss it.

which satisfies the jury of his guilt beyond a reasonable doubt. The Defendant is not required to prove his innocence.

And S-2(B), S-11, D-2(A), D-5(A), and D-13(A) all also instructed the jury that the State had to prove all of the elements of the crime beyond a reasonable doubt. In light of all of these instructions, we find that the trial judge did not abuse his discretion when he refused D-7 and D-8 as repetitive.

¶69.   Instruction D-9 provided:

> The Court instructs the jury that a reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of evidence, or the insufficiency of the evidence; but however it arises, if it arises, it is your sworn duty to find the Defendant Shunbrica Roby Not Guilty.

The trial judge refused D-9 as argumentative, with no response from defense counsel. Again, regardless of the judge's reason for refusing D-9, we find that he did not abuse his discretion, as the concept of reasonable doubt was covered extensively by other instructions. This issue is without merit.

**Instruction S-10**

¶70.   Roby objected to S-10 at trial, which stated:

> The Court instructs the jury that when two or more persons act together with a common design in committing a crime of violence upon another, and a homicide is committed by one of them incident to the execution of that common design, all are criminally liable for that homicide as the act of one is the act of all. Therefore, if you find from the evidence in this case beyond a reasonable doubt that the Defendant, Shunbrica Roby, together with Natisha Roby and/or Latwanna Roby, *acted with a common design in* <u>*committing an assault*</u> *upon Marcus Payne and a homicide was committed by one of them while engaged in that assault, then all are criminally liable for that homicide*, and each are equally guilty under the laws of the State of Mississippi.

27

(Emphasis added). She argues now on appeal that the trial judge erred by granting it, as it was an "incorrect statement of the law aimed at diminishing or destroying the significance of Roby's intent (deliberate design to kill Payne) as an element the jury was required to find beyond a reasonable doubt." Roby also argues that S-10 incorrectly suggested that "if [she] had the intent to assault but not kill Payne in the tussle that broke out between them, then Natisha and/or Latwanna's intent to kill Payne could be attributed to Roby."

¶71.    In *Welch v. State,* this Court wrote:

> To be convicted as an accessory the defendant *must possess the mens rea for the commission of the crime.* The precise state of mind of the defendant has great significance in determining the degree of his guilt. An accomplice may be convicted of accomplice liability *only for those crimes as to which he personally has the requisite mental state.* He must have a "community of intent" for the commission of the crime. *Malone v. State*, 486 So. 2d 360 (Miss.1986); *Shedd v. State*, 228 Miss. 381, 87 So. 2d 898 (1956).

*Welch v. State*, 566 So. 2d 680, 684 (Miss. 1990) (emphasis added). And in *Shedd v. State*, this Court said: "If two or more persons enter into a combination or confederation to accomplish some unlawful object, any act done by any of the participants *in pursuance of the original plan and with reference to the common object* is, in contemplation of law, the act of all. *Shedd v. State*, 87 So. 2d 898, 899 (Miss. 1956) (emphasis added).

¶72.    This Court applied this principle specifically to a factual scenario in *Huggins v. State*, 115 So. 213 (Miss. 1928). The defendant there (Huggins) was convicted of murder as a co-conspirator. *Id.* at 213. He and another man (Walton) had robbed a gas station. *Id.* Huggins got away, but the store owner captured Walton, who ended up killing the owner. *Id.*

28

¶73.    On appeal, Huggins argued that the evidence was insufficient to convict him of murder. *Id.* at 214. In addressing that issue, this Court wrote:

> In order that this appellant might be held to be guilty of the murder, *it was necessary that the joint enterprise and conspiracy should cover not only a design or purpose to commit the robbery or larceny, but should extend to and include the common purpose and agreement to resist arrest with great violence, or kill the deceased or other person who interfered with or attempted to apprehend them. If they had only the common purpose of committing larceny*, and the killing of the deceased by Walton was "merely the result of the situation in which he found himself, and proceeded from the impulse of the moment, without any previous concert," *the appellant would not be guilty of the murder*.

*Id.* (emphasis added).[5]

¶74.    And in a case involving a joint assault that resulted in a death—as we have here—this Court wrote:

> "In the absence of a conspiracy or common design the evidence must be sufficient, even in cases where the killing occurred in the course of a joint assault or affray, to show either that accused struck the fatal blow *or aided and abetted therein*. To justify the conviction of one who was not the actual slayer, where the proof does not show any prearrangement, conspiracy, or common design, the evidence must be sufficient to show that accused aided or abetted the actual slayer by overt act of assistance or oral expression of encouragement."
>
> *In order to render one responsible as an aider or abettor, it is essential that he share in the criminal intent of the direct actor*. "The common intention need not be formed before convening at the place of the crime. It may have arisen on the spur of the moment, *but it must exist at the time the crime is committed, and not merely before or after*." "'Aiding and abetting involves some participation in the criminal act' and this may 'be evidenced by some 'word, act, or deed.'"

---

[5]The Court found ultimately that the evidence was sufficient to convict Huggins, as he had admitted in his statement to police that he and Walton had "agreed to kill [the store owner], or any one else who interfered with them or attempted to prevent them from escaping." *Id.* at 214.

***Gibbs v. State***, 77 So. 2d 705, 707 (Miss. 1955) (citations omitted) (emphasis added).

¶75. In light of the foregoing authority, we find that S-10 was an incorrect statement of law. And the State seemingly concedes that S-10 was incorrect and/or confusing, arguing only that "there were three other instructions that properly placed the burden on the State to prove every element of the crime of murder beyond a reasonable doubt,"[6] and that the jury therefore "could not have been confused when all instructions were considered and read together as a whole."

¶76. We disagree with the State's argument. While it is true that some of the other instructions provided that the State had to prove all the elements of deliberate-design murder beyond a reasonable doubt, S-10 instructed the jury that the State had to prove only that Roby committed an *assault* beyond a reasonable doubt. In other words, if the jury found that Roby intended to commit an assault, she automatically was criminally liable for any resultant homicide, regardless of her intent. That is contrary to our law.

¶77. And the confusion brought about by S-10 was only heightened by the State's closing argument, in which the prosecutor argued that:

> One of them stabbed him during the course of that assault. This is the provision of law [referring to S-10] that says it does not matter which one of them had the knife. It does not matter which one of them struck the fatal blow. *If all three of them were participating in that assault, they are all equally liable for his death.*
> . . .
> You're told that I'm asking you to stretch and reach. Well, *if it's a stretch to ask you if she committed an assault on this victim*, then go ahead and stretch. That's the bottom line. *Did she engage in the assault?*

---

[6]The State cites instructions S-2(B), D-2(A) and D-13(A).

30

. . .

> And during the course of that assault, one of them stabbed him. He bled to death in the parking lot of a convenience store because of her. It does not matter if she had the knife in her hand. He is dead because of her.

(Emphasis added).

¶78. In sum, we agree with Roby that S-10 was an incorrect statement of the law, and we disagree with the State that any error and/or confusion was harmless. We therefore reverse the trial court's judgment and remand the case for a new trial based on this issue.

## CONCLUSION

¶79. Roby's conviction for first-degree murder was not against the sufficiency or weight of the evidence, and Roby forfeited her right to argue a Confrontation Clause violation. Further, the trial judge did not abuse his discretion when he refused jury instructions D-3, D-7, D-8, D-9 and D-10. But the trial judge did err when he granted instruction S-10, and we reverse the judgment of conviction and remand the case for a new trial based on that issue.

¶80. **REVERSED AND REMANDED**.

**WALLER, C.J., DICKINSON, P.J., KITCHENS, PIERCE, KING AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., AND MAXWELL, J., NOT PARTICIPATING.**